## ATLANTA, KNOXVILLE AND NORTHERN RAILWAY COMPANY *v.* TILSON.

1. The presiding judge did not err in overruling the motion for a nonsuit; and the evidence was sufficient to support the verdict.
2. That the judge in one portion of his charge used the expression "ordinary care" in connection with the duty of a railway employee, instead of "ordinary care and diligence," or did not use the expression "skill and diligence," will not require a reversal; especially where he defined the term "ordinary care," and the entire charge, taken together, shows that the jury were not likely to have misunderstood or been misled by the expression used.
3. When considered in connection with the charge as a whole, none of the other charges of which complaint was made contained error requiring a new trial.
4. The newly discovered evidence set up as a ground for a new trial merely tended to impeach or disprove some of the testimony of the plaintiff as to the extent of his damages, and the refusal to grant a new trial on that ground was not error.

Argued January 14,—Decided August 19, 1908.

Action for damages. Before Judge Gober. Cobb superior court. January 15, 1907.

Tilson sued on account of personal injuries, alleged to have been sustained by him in consequence of the negligence of the railway company. The petition alleged: At the time he received his injuries, and for some time prior thereto, he was employed by defendant as a freight-train hand, his position being that of head brakeman and flagman. It was his duty, in switching cars, to look out for the turning and managing of switches in front of the engine, and to ride on the pilot of the engine and "watch out" for danger in going into side-tracks. "An iron plate projects from the bottom and side of the pilot, which is about three or four inches wide and about twelve inches in length, for the head brakeman to stand upon to keep a watch out for danger in going into side-tracks." On the day when plaintiff was injured, the train arrived at a station called Oakhurst, in Cobb county; and the conductor ordered plaintiff to turn the switch and get on the pilot of the engine, so as to keep a watch out and let said train run into the side-track at this place, so that a passenger-train could pass the same. Plaintiff turned the switch as he was told, "and got on the iron plate above described, . . to ride

into said side-track and keep a watch out for danger." After he did so, the engineer began to run the engine up the side-track at a rate of speed of about six or seven miles per hour. The engine had only gone a short distance upon the side-track when it gave a sudden quick jerk or jar, which caused plaintiff to lose his balance and his feet to slip from the iron plate attached to the pilot, whereby he was thrown on the side-track, and the wheels of the engine passed over his left leg and mashed and crushed it so that it had to be amputated just below the knee. The jerk or jar of the engine, from which plaintiff's injuries resulted, was caused by described defects in the side-track, of which defendant was aware and of which the plaintiff had no knowledge when he started, and by alleged negligence on the part of the engineer. Plaintiff was inexperienced and unacquainted with the dangers of railroading, and the conductor had ordered him to the position where he stood when hurt. He was free from fault, and his injuries were caused by negligence of defendant in specified particulars. The age of the plaintiff at the time of the occurrence complained of, his then physical condition and earning capacity, and the amount of expense incurred by him in consequence of his injuries were alleged. He sought to recover for permanent diminution of earning capacity, physical and mental pain and suffering, and the expenses incurred. The defendant denied all these allegations of the petition; and alleged that if plaintiff was injured at the time and place alleged, it was the result of an accident without negligence on its part, for which it was not responsible. It also pleaded, that, if plaintiff was injured at the time and place as alleged, the injury was caused by his own want of care and diligence, and that by the exercise of ordinary care he could have avoided the injury, and that for these reasons he was not entitled to recover.

Upon the trial the plaintiff testified, in part, as follows: "I was the front brakeman. . . We arrived at Elizabeth a short time after leaving Marietta. At Elizabeth we stopped, . . and the conductor . . passed me while we were there, . . and he said, 'Tilson, we will meet number one passenger-train, southbound, at Oakhurst,' and asked me if I knew anything about that switch, and I told him 'I didn't think I did, and he said, 'Ride the pilot of the engine and see if there is any monkey-switches.' I was to do that at Oakhurst. . . I was under the conductor.

The conductor gave me orders as to what I should do at the various stations and sidings. When we arrived at Oakhurst, I threw the switch and got on the pilot and started in. The siding there is a spur that leads out from the main line and stops. . . There was a little place on the pilot three or four inches wide for a man to stand on. It was constructed to stand upon. It is three or four inches in width, and 12 to 18 inches long. It is iron. It is on both sides of the pilot. . . I went straight from the switch-stand to the track when I boarded the pilot. . . I stood up on the pilot with both my feet. As my train went into that siding, I felt a very sudden jerk, and it jerked me off. I had ridden some twelve or fifteen feet on the pilot before I felt the jerk. It was something more than an ordinary rock of the engine; it jerked me off. I felt the engine give down and give a sudden jerk, and it jerked me off." A portion of his cross-examination is reported as follows: "I don't know whether it [the engine] was rolling or not at the time that I got up. It was either still or very near still. I have forgotten about that. It was not running from four. to six miles an hour. I don't remember how fast it was rolling— whether it was rolling any or not. I don't think it was rolling at from four to six miles an hour. I don't think it was rolling at that rate. It was not rolling but very little, if any. I was sworn on the trial of this case formerly and examined as a witness in my behalf. Q. Were you not asked this question: 'Isn't it a fact that the train was rolling at the rate of five or six miles an hour?' and didn't you answer, 'I don't remember; I couldn't say about that. I got on so many times. I don't remember about that?' A. I believe I stated it about that way. Q. Then were you not asked this: 'Now, what do you say as to whether or not the train was moving?' Answer: 'I couldn't say about that; I don't remember whether it was moving, or how fast, or anything about that.' Isn't that the answer you gave at that time? A. I don't remember whether—I believe I did—something near that. At the time I got on the engine it was somewhere near the switch-stand. The engine was very near still, if not plumb still; I couldn't say how fast or how slow. I said I didn't get on it when it was rolling very fast. It had to be very slow, or I would not have got on at all. I got on them standing still a heap of times. Q. From the fact that you got on them so often while they were

rolling, you couldn't say at this particular time whether it was rolling or not? Witness. Did I say I got on it rolling several times? Counsel. You said this: 'I don't remember; I couldn't say about that; I got on so many times, I don't remember about that.' Witness. All I say in that, it was rolling when I got on.

. . Q. Mr. Tilson, you haven't got any recollection about how fast that engine was moving? A. No, sir, but I think it was very near still. I can't remember as to how fast it was rolling at that time. . . I don't remember whether that was a straight side-track or not; I don't think it was exactly straight. It was a practically straight spur-track, right out before you, on level ground, with a little cut where it started out—a very small affair. A monkey-switch is a switch that throws one rail. The purpose of the monkey-switch is, if there is a number of dead cars standing on a side-track, and that by any reason they should be moved or get to rolling and roll down the side-track, they would go out on the monkey-switch, and not on the main line; to prevent obstructing the main line and 'to prevent wrecks. . . A monkey-switch on that side-track would have been fifty or seventy-five yards, possibly a hundred, from the switch where we turned it. . . I had ridden a pilot before. It looked to be a very dangerous place to ride. It looked to be such a place as to be a warning to any man that it was a dangerous place to be. It was something like a little rim that came around part of the cow-catcher not wider than your three fingers—three or four inches. It was put there to aid the man who has to lift the drawhead. It is its purpose to furnish a foothold when a man goes to lift the drawhead up for the purpose of connecting with something in front of the engine, and to ride on when it is necessary to ride in front. . . The drawhead on my engine was one that had to be raised to couple cars in front. The drawhead was a very heavy object; and therefore the necessity for a place to stand upon. That rim is something like twelve or fourteen or eighteen inches long. If it was eighteen inches, a man with about ordinary sized feet would occupy the whole length of it. I expect his foot was wider than the rim. . . I believe it was twelve or fifteen feet—ten, twelve, or fifteen feet after I had gotten upon this rim before I got this fall. . . I did not fall off almost immediately after I attempted to mount the rim of this engine. The way it was rolling, twelve

or fifteen feet would not be but a little while. I couldn't say how many revolutions of the driver. . . I had not been railroading very long. I was very green about them things. I was very green, and went upon a place that was very dangerous to ride upon, when I had orders. If I hadn't, I could not stay with them very long. I had to obey his orders. If he had told me to jump in front of the engine, I wouldn't have done it if I knew it was dangerous." The plaintiff also testified: "I don't think the man on the engineer's box could see the track clear ahead. It was grown up in grass and weeds, and I don't think he could have seen the rail. I don't swear he could not. . . The engineer can see the rails ahead of him on a straight track. . . He has a box out to one side that gives him a plain view of a straight track; but a monkey-switch is hard to see."

Jones, the fireman who was on the engine, and the only other witness for plaintiff as to what occurred at the time he received his injuries, testified: "Mr. Tilson was front brakeman and was placed out on the front of the train. When there were switches to turn, I suppose it was his place to turn them. It was the front brakeman's job. As we got to Oakhurst, Mr. Tilson threw the switch. He was standing at the switch-stand when I saw him throw the switch. I could see him from where I was throw the switch; and as I pulled down in the side-track, I saw him turn away from the switch and [he] got out of my sight. He turned his face towards the track. That would have put him on the track right at the switch-stand. I did not see him when he got on the pilot. I felt the engine jerk—give down—as we went in on the side-track. When I felt the engine give down, we had just got, I think—the engine was right on the switch point. The front trucks was somewhere about ten or twelve feet, maybe fifteen; I couldn't say exactly how far it was. . . When I felt that drop, the engineer put his air on, in emergency. . . He stopped right immediately after he put his air in emergency—didn't go, I don't suppose, more than three or four feet, or maybe not that far. The engine was going at that time about three or four miles an hour. The effect of putting air in emergency brings the train to a very sudden stop. I stepped down in the gangway as soon as he put his air on, and saw Mr. Tilson lying in the ditch.. . . I couldn't say how far Mr. Tilson was lying from the switch point. It must

have been ten feet, or something like that. . . Our train stopped before we reached the switch. Before we stopped, Tilson got off and went to the switch. I don't remember where he was when he got off the engine to throw the switch, but he was on the engine.

. . I don't remember whether he left the engine before we stopped or not; I couldn't say. . . When I got off my seat and walked out to where I could see him, Tilson was lying down in the ditch, nearly opposite the engineer, right under the cab window. As well as I remember, he was in three or four feet of the cab.

. . I suppose the distance from the pilot to where he was lying was the distance the engine ran after he fell; I suppose it was. . . The engineer was on his seat and looking out at the time I felt this jerk. There was nothing about the handling of the engine to cause the jerk. The engine was going along at an even pace. . . He was not handling the engine. It was rolling into the side-track without working any steam. He shut his steam off, and the engine rolled on; and when that give down, he put his brake in emergency and stopped. I suppose an engine is about thirty feet long, or something along there. . . Tilson was at the front trucks, I suppose. He was not there when I saw him. He must have got on the front trucks. I saw mud on the steps, where his feet was on it. It was slick and muddy all around there." He testified also that the engine stopped about thirty feet before it reached the switch that Tilson went to turn.

The defendant moved for a nonsuit, which was refused. The trial resulted in a verdict for plaintiff. A motion for a new trial was made, which was overruled; and the defendant excepted to each of the rulings stated.

*Tye, Peeples, Bryan & Jordan* and *D. W. Blair,* for plaintiff in error. *Arnold & Arnold* and *N. A. Morris,* contra.

LUMPKIN, J. 1. After a careful examination of the evidence in this case, we are of the opinion that the presiding judge did not err in refusing to grant a nonsuit. The plaintiff testified, among other things, that the conductor gave him orders what to do at the various stations and sidings; that he had to obey orders, or, if he had not done so, he could not have stayed with the road very long; that at the time of the injury he was acting under such orders in riding on the pilot of the engine at a siding, to see if there were any "monkey-switches;" that "monkey-switches" are hard

to see from the engineer's box, because many of them have no "stand out" on the side of the track; that, being lately employed, plaintiff was not familiar with this siding; that there was a little place on both sides of the pilot, three or four inches wide and twelve to eighteen inches long, for a man to stand on, constructed for that purpose, and to furnish a foothold when one went to lift the drawhead in order to connect it with something in front of the engine, "and to ride on when it is necessary to ride in front;" that while thus engaged he was thrown off by a sudden jerk (which the evidence indicated resulted from a defect in the track) ; that at the time he got upon the engine it was nearly or quite still, and at the time when he was thrown off it was running three or four miles an hour. Whether he was guilty of negligence in getting upon the engine in obedience to the order of the conductor, or in the manner in which he discharged his duty, was a question of fact for the determination of the jury, not to be solved by the grant of a nonsuit. It is true that he said that "it looked to be a very dangerous place to ride." If asked whether it was not dangerous to couple cars, or to climb up the side of a freight-car on a ladder, or ride on any part of the engine when at full speed, a witness might be compelled to answer in the affirmative. Still it will not necessarily bar a recovery, as matter of law, to engage in an occupation involving some danger, or to occupy a position prepared for the purpose, and which an employee is directed to occupy, unless doing so amounts plainly to negligence, or unless the injury results from a risk which he assumes. While an employee assumes the ordinary risks of a dangerous occupation, it could hardly be said that carelessness on the part of the engineer in the operation of his engine, or on the part of the company in regard to its track, of which he had no notice, was one of the usual and ordinary risks assumed by a "freight hand" in the discharge of his duty, so as to present a legal bar to a recovery by him, under our statute allowing a recovery by an employee of a railroad, who is not at fault, and who is injured by negligence of other employees. Civil Code, §2323. The cases in which it was held that a plaintiff could not recover are readily distinguishable from that at bar, upon an examination of their facts. Thus, for instance, in *Roul* v. *East Tennessee, Virginia & Ga. Ry. Co.*, 85 *Ga.* 199 (11 S. E. 558), a servant of a railroad company obeyed the order of a superior servant to

mount a locomotive running at a speed of from six to twelve miles an hour. In *Mayfield* v. *Savannah, Griffin & Northern Ala. R. Co.*, 87 *Ga.* 374 (13 S. E. 459), the plaintiff undertook to get upon the rim of the pilot of an engine, which was only one and a half inches broad, while the engine was running at a speed of four or five miles an hour. Under the evidence, we are of the opinion that it was for the jury to say whether it was necessary for the plaintiff to have ridden in front of the engine at the time when the injury occurred, or whether he was negligent in obeying the order of the conductor, or in the manner in which he performed his duty. It is not to be determined, as matter of law, that the plaintiff should have refused to obey, and should have run along the track ahead of the engine, instead of getting upon the place prepared for an employee to stand when it was necessary to ride in front. The judge correctly refused a nonsuit; and there was sufficient evidence to sustain the verdict.

2. One ground of the motion for a new trial assigned error on the following charge: "Now you are instructed that the plaintiff was bound to use only ordinary care, in view of the actual circumstances of the situation. Ordinary care, as I have said, is that care which every prudent man would use under the same or similar circumstances. If the jury believe that, under the circumstances in this case, the plaintiff was exercising such reasonable care as I have defined to you, and if you further believe that he was injured by the running of the defendant's cars or engine, and was free from fault, then I charge you that the law presumes that the railroad company was negligent, and are liable in this case; that is, unless they show that the plaintiff was at fault." The errors assigned in this charge were: (1) It was error to restrict the duty of the plaintiff to only "ordinary care," whereas the law required that he must exercise both "ordinary care and diligence" to prevent injury to himself; in lieu of the language given, the court should have instructed the jury that the plaintiff was "bound to exercise his own skill and diligence to protect himself;" the language used by the court put a less burden upon the plaintiff than that imposed by law, and consequently was hurtful to the defendant. (2) The charge did not restrict the jury in their finding to conclusions from the evidence in the case, but authorized them to make a verdict in favor of the plaintiff from what

they believed under the circumstances in the case. (3) The charge excluded from the jury the defense that the railroad company and its other employees were free from fault and negligence, and restricted them to showing that the plaintiff was at fault. (4) It was calculated to confuse the jury.

We shall not consider whether this charge may have been open to any possible objection, but shall only deal with the assignments of error made in regard to it. The first objection is that the court used the expression "ordinary care," instead of "ordinary care and diligence" or "his own skill and diligence." We do not understand the assignment as raising a contention that the employee was bound to use more than ordinary care and diligence, or would be prevented from recovering by negligence less than that involved in lack of ordinary care; but rather as to the mere use of the words "ordinary care" without adding thereto skill or diligence. The court instructed the jury that "if you further believe that he was injured by the running of defendant's cars or engine, and was free from fault," a presumption of negligence would arise against the company; and that if he was free from fault, and the defendant was negligent, the latter would be liable; and that if he made out a prima facie case, the defendant could rebut it by showing either that he was negligent, or that it was free from fault. The terms "ordinary care" and "ordinary diligence" are commonly treated as synonymous or interchangeable, when applied to the same conduct, in cases of injury; and the mere employment of the expression "ordinary care" in a particular portion of a charge, instead of "ordinary care and diligence," will not require a new trial, especially where the presiding judge defined the meaning of the term ordinary care as employed in the law, and the entire charge showed that there was no peculiar or restricted meaning attached to its use in the particular part to which exception was taken. *Central of Georgia Ry. Co.* v. *Mote,* ante, 166 (62 S. E. 164); *Goodwyn* v. *Central of Georgia Ry. Co.,* 2 *Ga. App.* 470 (58 S. E. 688). When considered in connection with the entire charge, the portion of it on which error was here assigned was not subject to the criticisms made upon it, and did not require a new trial.

3. Several complaints were made of charges and omissions to charge; but when the entire charge is read as well as the statement of the presiding judge that no requests were made to charge as to

the matters involved in the alleged omissions, there was nothing requiring a new trial.

4. The newly discovered evidence was merely impeaching in its character, and tended to show that the pecuniary loss resulting to the plaintiff was not as great as he had claimed in his testimony. The refusal to grant a new trial on this ground will not require a reversal.

*Judgment affirmed. All the Justices concur.*